Charlotte **KENNEDY** and Robert Kennedy, Plaintiffs,

v.

**COLLAGEN CORPORATION, Defendant.**

No. C 89–2331–CAL.

United States District Court, N.D. California.

June 26, 1997.

Lon D. Packard, Packard Packard & Bennion, Palo Alto, CA, Michael M. Essmyer, Clinard J. Hanby, Essmyer & Hanby, Houston, TX, for Plaintiffs.

Kevin J. Dunne, Kathleen D. Patterson, Michael F. Healy, Margaret L. Eaton, William P. Keane, Asst. U.S. Atty., San Francisco, CA, Sedgwick Detert Moran & Arnold, Joe W. Redden, Beck Redden & Secrest, Houston, TX, for Defendant.

## ORDER FOR SUMMARY JUDGMENT

LEGGE, District Judge.

In 1982 plaintiff Charlotte Kennedy was treated by her doctor with defendant Collagen Corporation's Zyderm Collagen Implant. She claims to have subsequently developed atypical systemic lupus erythematosus ("atypical SLE"). She alleges causes of action for negligence, strict liability, breach of express and implied warranty, battery, and conspiracy against Collagen. Her husband, plaintiff Robert Kennedy, alleges a cause of action for loss of consortium.

Defendant moves for summary judgment, arguing that plaintiffs have not presented any admissible evidence from which a jury can find that Zyderm caused Ms. Kennedy's atypical SLE.

### I.

Plaintiffs' expert witness on the issue of causation is Dr. Joseph Spindler. He is the *only* witness who is offered by plaintiffs to testify that Zyderm caused Ms. Kennedy's condition. Dr. Spindler last examined Ms. Kennedy in 1990, and his affidavit was filed by plaintiffs in opposition to a motion for summary judgment by defendant in 1990. In his affidavit, Dr. Spindler states that:

> Mrs. Kennedy's medical history, records and current laboratory results are consistent with a temporal relationship between her injections and her medical condition, including a severe adverse reaction to Defendant's product, with systemic immune disorders and deteriorating medical condition and clinical symptoms....

> Based on reasonable medical probability, Mrs. Kennedy suffered a definite adverse systemic immunological reaction to the bovine collagen injections, which injections triggered her systemic immunological injuries. This systemic immunological reaction has caused and was a substantial factor, if not the factor, in causing a changing immunological picture for Mrs. Kennedy; and with the temporal relationship, it appears the injections acted as a trigger in the development and progression of her evolving systemic-immune condition and disorders.

### II.

In 1990 this court granted summary judgment for defendant, finding that Dr. Spindler's affidavit was insufficient to create a genuine issue of material fact on causation, because it identified only a "temporal relationship." "[T]emporal priority does not establish causal force: it is a logical fallacy to reason *post hoc, ergo propter hoc.*" *People v. Benson,* 52 Cal.3d 754, 781, 276 Cal.Rptr. 827, 802 P.2d 330 (1990); *see also Hardt v. Heidweyer,* 152 U.S. 547, 558, 14 S.Ct. 671, 38 L.Ed. 548 (1894) (noting that "the rule of causation implies some other sequence than that of time").

The Ninth Circuit initially affirmed this court's grant of summary judgment, but then reversed and remanded after a petition for rehearing, holding that Dr. Spindler's affidavit created a genuine issue of material fact on causation. The Ninth Circuit rejected the contention that Spindler's opinion is based predominantly on the "temporal relationship" between Ms. Kennedy's treatment with Zyderm and her disease, stating that: "The district court was inaccurate in believing that Dr. Spindler's opinion was based primarily

on the temporal relationships between the Zyderm injections and Kennedy's injuries...." *Kennedy v. Collagen Corp.*, No. 91-15597, 1992 WL 217803, *3 (9th Cir. Sept. 8, 1992). The court held that Dr. Spindler's affidavit established the existence of a genuine issue of material fact regarding causation and was sufficient to preclude summary judgment. *Id.* at *1, *3, and *3 n. 2.

### III.

■ After the Ninth Circuit's decision in this case, the United States Supreme Court decided *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (hereinafter *"Daubert I"*), which explained that Federal Rule of Evidence 702 governs the admissibility of expert scientific testimony. Under *Daubert I*, federal judges must make two determinations in order to find expert scientific testimony admissible: (1) that the testimony reflects "scientific knowledge," which the Court defined as "derived by the scientific method," *Id.* 509 U.S. at 590; and (2) that the evidence has "a valid scientific connection to the pertinent inquiry," sometimes described as the requirement of "fit." *Id.* at 591–592.

The Ninth Circuit did not analyze the admissibility of Dr. Spindler's testimony under that standard when it decided this case on appeal. Defendant again moves for summary judgment, arguing that plaintiffs have not created a genuine dispute as to any material fact on the issue of whether Zyderm caused plaintiff's injury under the *Daubert I* standard. Because *Daubert I* and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311 (9th Cir.1995) (hereinafter *"Daubert II"*), have changed the legal standard by which federal courts should determine the admissibility of expert scientific testimony, this court re-examines the admissibility of Dr. Spindler's opinion under that standard. Dr. Spindler's opinion is still as defined in his 1990 affidavit. Dr. Spindler has offered no additional affidavit. And his deposition, taken in 1997, states no additional scientific basis under the first step of *Daubert I* for his opinion on causation.

In *Daubert I*, the Supreme Court discussed several factors relevant to the court's inquiry into whether offered expert scientific testimony satisfies the first step under Fed.

R.Evid. 702, including: whether the theory or technique employed by the expert is generally accepted in the scientific community; whether it has been subjected to peer review and publication; whether it can be and has been tested; and whether the known or potential rate of error is acceptable. *Id.* at 593–594 (noting also that "we do not presume to set out a definitive checklist or test").

■ The Ninth Circuit's decision on remand in *Daubert II* added that judges should examine whether the expert is testifying about matters growing naturally out of his research, or whether he has developed his testimony expressly for the purpose of testifying. *Id.* at 1317. Where, as here, the proffered expert testimony is not based on independent research, "the party proffering it must come forward with other objective, verifiable evidence that the testimony is based on 'scientifically valid principles.'" *Id.* at 1317–1318. This can be accomplished by presenting evidence of peer review. *Id.* at 1318.

Plaintiffs cite an article co-authored by Dr. Spindler. Jean Cukier, M.D., et al., *Association Between Bovine Collagen Dermal Implants and Dermatomyositis or a Polymyositis–Like Syndrome*, 118 Annals of Internal Med. 920 (1993). That study, however, dealt with patients who developed dermatomyositis or a polymyositis-like syndrome, not atypical SLE, after exposure to Zyderm. It is undisputed that Ms. Kennedy did not develop either of those conditions and that atypical SLE is a different autoimmune disorder. Neither Dr. Spindler, nor any other member of the scientific community, has contended in a peer-reviewed journal that Zyderm or any other collagen implant causes SLE or atypical SLE. In *Daubert II*, as in this case:

> the only review the plaintiff's experts' work has received has been [in litigation].... Despite the many years the controversy has been brewing, no one in the scientific community—except [plaintiffs'] experts—has deemed these studies worthy of verification, refutation or even comment. It is as if there were a tacit understanding within the scientific community that what's

going on here is not science at all, but litigation.

*Daubert II,* 43 F.3d at 1318.

The *Daubert II* court noted that if plaintiffs cannot present evidence that the expert's testimony grows out of pre-litigation research or that the research has been subjected to peer review, the experts themselves may "explain precisely how they went about reaching their conclusions and point to some objective source ... to show that they have followed the scientific method as it is practiced by (at least) a recognized minority of scientists in their field." *Id.* at 1319.

Defendant challenges Dr. Spindler's methodology, arguing that his hypothesis about causation is untested and based on this single case of Ms. Kennedy. With regard to the scientific validity of case reports, this court said in *Casey v. Ohio Medical Products,* 877 F.Supp. 1380 (N.D.Cal.1995), that: "case reports are not reliable scientific evidence of causation, because they simply describ[e] reported phenomena without comparison to the rate at which the phenomena occur in the general population or in a defined control group; do not isolate and exclude potentially alternative causes; and do not investigate or explain the mechanism of causation." *Id.* at 1385; *see also Pick v. American Medical Systems,* 958 F.Supp. 1151, 1161 (E.D.La. 1997) (noting that "courts have frequently rejected case studies as an insufficient basis to decide causation when they lack control groups").

Dr. Spindler testified in his deposition that Ms. Kennedy is the only patient he has ever examined who had exposure to Zyderm and also developed SLE or atypical SLE. He admits that there is no consensus in the rheumatologic community that Zyderm causes SLE, that neither he nor anyone else has performed any epidemiological studies to determine whether Zyderm causes SLE, that no study in the peer-reviewed literature indicates that Zyderm causes SLE, and that no animal studies exist linking Zyderm to SLE.

In a similar case, *Hall v. Baxter Healthcare Corp.,* 947 F.Supp. 1387 (D.Or.1996), the plaintiffs alleged that the defendants' breast implants caused atypical connective tissue disease ("ACTD"). Like atypical SLE, the relevant medical community did not general-

ly accept the existence of ACTD as of the date of the plaintiffs' experts' opinions. Further, as in this case, ACTD had no specific diagnostic test and no signature disorder. The *Hall* court concluded that: "Because ACTD is at best an untested hypothesis, there is no scientific basis for any expert testimony as to its causes and presence in plaintiffs." *Id.* at 1402. The court granted the defendants' motions to exclude the plaintiff's expert's testimony.

Dr. Spindler did testify in his deposition that there is some evidence that Zyderm can stimulate the immune system to produce autoantibodies which may then play a role in causing SLE or atypical SLE. He compared his hypothesis about Ms. Kennedy's condition to an accepted rheumatological condition called "drug-induced lupus," in which a patient will develop SLE after exposure to certain medications, and the symptoms will improve after removal of the irritating substance. Drug-induced lupus is a condition that apparently has no epidemiological basis, and no clinical or animal studies have been done to demonstrate its existence. Dr. Spindler does not contend that Ms. Kennedy has drug-induced lupus, but only that her exposure to Zyderm may have caused her present condition by a mechanism similar to that which causes drug-induced lupus.

Notwithstanding Dr. Spindler's comparison of atypical SLE to drug-induced lupus, *none* of the various factors discussed in *Daubert I* and *Daubert II* weigh in favor of a finding that Dr. Spindler's testimony is based on "scientifically valid principles." Accordingly, Dr. Spindler's testimony is inadmissible because it fails to satisfy the first step of the required analysis under Fed.R.Evid. 702. This court therefore need not discuss the second step.

## IV.

Dr. Spindler's testimony is inadmissible under Rule 702 because it is not based on the scientific inquiry required by the first step of *Daubert I.* This court therefore GRANTS defendant's motion for summary judgment, because without Dr. Spindler's testimony, the only offered evidence on causation, plaintiffs will not be able to establish their prima facie

case at trial. And the absence of causation is fatal to all of plaintiffs' alleged causes of action.

IT IS SO ORDERED.