# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 02-2627

———————

Donna Kudabeck,                                     \*

                                                 \*

       Plaintiff - Appellee,            \*

                                                 \*

Steven Kudabeck,                    \*   Appeal from the United States

                                               \*   District Court for the

       Plaintiff,                   \*   Western District of Arkansas.

                                                 \*

       v.                               \*

                                                 \*

The Kroger Co.,                      \*

                                                 \*

       Defendant - Appellant.       \*

———————

Submitted: January 16, 2003
Filed: August 4, 2003

———————

Before HANSEN,[1] Chief Judge, BRIGHT, and SMITH, Circuit Judges.

———————

BRIGHT, Circuit Judge.

      Donna Kudabeck slipped and fell at a Kroger grocery store in Hot Springs, Arkansas. Kudabeck sued Kroger, arguing that as a result of the accident she suffers

———————

[1]The Honorable David R. Hansen stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on March 31, 2003. He has been succeeded by the Honorable James B. Loken.

from advanced degenerative disc disease and osteoarthritis in her back. Kroger agrees that Kudabeck has these conditions. However, Kroger argues that the fall did not trigger Kudabeck's condition. Prior to trial, Kroger filed a motion in limine, seeking to exclude the testimony of Kudabeck's chiropractor, Dr. Brian Reilly. The district court[2] denied the motion. The case proceeded to trial, where a jury found in favor of Kudabeck in the amount of $260,961.67. Kroger appeals, arguing that the district court erred in admitting the expert testimony of Dr. Reilly and in instructing the jury on the aggravation of preexisting conditions. We affirm.

I.     BACKGROUND

We take the version of the evidence in the light most favorable to the jury's verdict. Salitros v. Chrysler Corp., 306 F.3d 562, 566 (8th Cir. 2002). On April 13, 1995 around 11:00 p.m., Donna Kudabeck, age forty-four, and her daughter were shopping at a Kroger store in Hot Springs, Arkansas. As Kudabeck and her daughter walked down one of the aisles, Kudabeck's legs slipped out from under her and she fell to the floor, landing on the base of her spine. After the fall, Kudabeck and her daughter noticed that the floor had been recently mopped. They did not see "wet floor" signs in the area.

Kudabeck did not seek emergency medical treatment. However, a week later she still experienced pain and discomfort. She visited with a chiropractor, Dr. Brian Reilly. At the initial examination, Dr. Reilly took x-rays of Kudabeck, and found problems in Kudabeck's lumbar and cervical vertebrae areas. Dr. Reilly did not see any signs of arthritis. Based on his observation that Kudabeck did not have a fever or redness in her back, Dr. Reilly ruled out infection as a source of Kudabeck's discomfort. Dr. Reilly performed orthopedic tests to rule out other sources of pain

---

[2]The Honorable Robert T. Dawson, United States District Judge for the Western District of Arkansas.

such as the arms, legs, pelvis, and hips. Finally, Dr. Reilly used Kudabeck's medical history generally to rule out genetic sources of her pain. Dr. Reilly attributed Kudabeck's pain to the fall.

After several months of treatment, Dr. Reilly did not note much improvement in Kudabeck's condition. He referred Kudabeck to Dr. Paul Tucker, a neurologist. In February 1996, Dr. Tucker examined Kudabeck and ordered a magnetic resonance imaging test (MRI) and a series of x-rays. Dr. Tucker's examination revealed that Kudabeck had "surprising weakness" in all of her major muscle groups. In reviewing her MRI, Dr. Tucker noted possible disc herniations in the cervical spine area and problems in the lumbar spine. Kudabeck's x-rays, taken a few weeks after the MRI, indicated that she may have had a minimal compression fracture.

Dr. Tucker referred Kudabeck back to Dr. Reilly for further treatment. Over the next several months Kudabeck saw both Drs. Reilly and Tucker. Kudabeck received a variety of treatments and medications, none of which relieved her pain. Dr. Reilly continued to examine Kudabeck until May 1996.[3] Dr. Tucker continued to treat Kudabeck until at least November 1998.[4]

Kudabeck's condition continued to deteriorate. In July 1996, Dr. Tucker's notes indicated that Kudabeck was "now severely handicapped and cannot do much

---

[3]Dr. Reilly examined Kudabeck again in March 2002 to assess a permanent injury rating. Dr. Reilly assessed Kudabeck with a ninety-six percent whole-person permanent impairment rating.

[4]Dr. Tucker did not testify at trial, however, the parties submitted Dr. Tucker's reports to the jury. The last date in Dr. Tucker's reports is November 1998.

of anything." (Trl. Ex. 11.) As stated previously, Kudabeck sued Kroger, arguing that the fall resulted in a permanent injury.[5]

After suing Kroger, Kudabeck saw Dr. Steve Cathey, a neurosurgeon, regarding her condition. At that time, Kudabeck complained of severe pain in her neck, middle back, and lower back. Dr. Cathey noted that Kudabeck's pain had been present for a number of years and that she had received a variety of medications, physical therapy, and chiropractic treatment, but none afforded much relief. In his videotaped deposition played at trial, Dr. Cathey opined that Kudabeck suffered from advanced degenerative disc disease and that he believed that she had arthritis in the spine. Dr. Cathey explained that in his opinion Kudabeck's fall aggravated pre-existing conditions in her neck, middle back and lower back, and "set into motion [Kudabeck's] symptomatology." (J.A. at 55.)

Prior to trial, Kroger filed a motion in limine, seeking to exclude the testimony of Dr. Reilly. The district court did not hold a Daubert[6] hearing to consider argument on the issue. Instead, in a written order based on the record presented to it, the court held Dr. Reilly's testimony on causation was admissible as long as Kudabeck established that his opinion was the product of reliable principles and methods properly applied to Kudabeck's case.

At trial, Kudabeck presented the videotaped deposition of Dr. Cathey, and provided the jury with Kudabeck's medical records from Dr. Tucker. Kudabeck called Dr. Reilly as an expert witness. Kroger once again objected to Dr. Reilly's testimony, and the district court allowed Dr. Reilly to testify with limitations.

---

[5]Kudabeck's husband, Steven Kudabeck, sued Kroger for loss of consortium. The jury found against Steven. The parties have not appealed that finding.

[6]Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).

Kudabeck's main theory of the case was that the fall triggered Kudabeck's pain, suffering and disability.

Kroger did not call any medical experts to dispute Kudabeck's theory of the case. However, Kroger's position was that it did not act negligently. Kroger also argued it was entitled to a jury instruction relating to the aggravation of preexisting conditions. The court provided Arkansas Model Instruction 2203,[7] but declined to provide the optional language: "However, you may not award her damages for any pain, mental anguish or disability which she would have suffered even though the accident had not occurred." The court declined to provide the instruction based on Kroger's failure to present evidence to support the instruction.

After hearing one day of testimony, the jury found that Kroger acted negligently, which proximately caused damage to Kudabeck.[8] The jury awarded

_____

[7]The court provided the following instruction from the Arkansas Model Jury Instructions:

In this regard you should consider the full extent of any injury sustained, even though the degree of injury is found by you to have proximately resulted from the aggravation of a condition that already existed and that predisposed Donna Kudabeck to injury to a greater extent than another person.

[8]The first interrogatory presented to the jury asked "[d]o you find from a preponderance of the evidence that there was negligence on the part of the defendant which was a proximate cause of any damages?" An earlier jury instruction defined "proximate cause" as:

The law frequently uses the expression "proximate cause," with which you may not be familiar. When I use the expression "proximate cause," I mean a cause which, in a natural and continuous sequence, produces damage and without which the damage would not have

-5-

Kudabeck $260,961.67 in damages. The district court reduced the award by the amount Kroger had already paid in Kudabeck's medical expenses, resulting in a final judgment of $255,382,67. Kroger timely appeals.

## II. DISCUSSION

We review for the abuse of discretion a district court's decision to admit or exclude scientific evidence. General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997); In re Air Crash at Little Rock Arkansas, on June 1, 1999, 291 F.3d 503, 509 (8th Cir. 2002). A trial court has broad discretion in assessing the relevance and reliability of expert testimony. Id. at 514.

### A. Expert Testimony

On appeal, Kroger argues that the district court abused its discretion in permitting Dr. Reilly to testify because his testimony about the causation of Kudabeck's injuries was unreliable.

Federal Rule of Evidence 702 governs the admissibility of expert opinion testimony. The rule consists of three distinct but related requirements: (1) the evidence must be based on scientific, technical or other specialized knowledge that is useful to the finder of fact in deciding the ultimate issue of fact; (2) the witness must have sufficient expertise to assist the trier of fact; and (3) the evidence must be reliable or trustworthy. Lauzon v. Senco Prod., Inc., 270 F.3d 681, 686 (8th Cir. 2001). The basis for the third requirement lies in the recent amendment to Rule 702, which added the following language: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

---

occurred."

-6-

Fed. R. Evid. 702.  In <u>Daubert</u>, the Supreme Court charged trial judges with the responsibility of acting as gatekeepers to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  <u>Daubert</u>, 509 U.S. at 589.  First, the trial court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."  <u>Id.</u> at 592-93.  The Court cautioned that the trial court must focus "on [the] principles and methodology, not on the conclusions that they generate."  <u>Id.</u> at 595.  Second, the court must ensure that the proposed expert testimony is relevant and will serve to aid the trier of fact.  <u>Id.</u> at 592.  Expert testimony assists the trier of fact when it provides information beyond the common knowledge of the trier of fact.  <u>Id.</u> at 591.  The Court, in <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137 (1999), clarified that the district court's gatekeeper function applies to all expert testimony, not just testimony based in science.  <u>Id.</u> at 147.

Kroger does not contest that Dr. Reilly possesses the qualifications to testify as an expert under Rule 702.  The district court acknowledged that Dr. Reilly qualifies as an expert in chiropractic treatment.[9]  Kroger also does not contest that Dr.

---

[9]Arkansas law provides:

(6)(A) "Practice of chiropractic" means the engagement in the diagnosis and analysis of any interference with normal nerve transmission and expression, and the procedure preparatory to and complementary to the correction thereof by an adjustment of the articulations of the vertebral column, its immediate articulations, including spinal adjustments, spinal manipulations, and spinal mobilizations, such as any type of pressure, force, thrust, or passive movement, singular or plural, applied to the spinal vertebrae or their adjacent articulations by hand or mechanical device or by other incidental adjustments, for the restoration and maintenance of health. The practice of chiropractic includes therapy, the normal regimen, and rehabilitation of the patient for the purpose of removing any injury,

Reilly's testimony would assist the jury. Thus, the issue of contention between the parties centers on whether Dr. Reilly's methodology is reliable.

Kroger argues Dr. Reilly's testimony is inadmissible because he failed to perform a differential diagnosis to exclude other contributing factors to Kudabeck's degenerative disc disease, instead he relied on Kudabeck's word in determining causation. Kroger also argues that Dr. Reilly's testimony is unreliable because he failed to cite published studies on causation to support his conclusion.

First, Kroger argues Dr. Reilly's testimony as to causation is unreliable because he failed to perform a differential diagnosis to exclude other potential sources of degenerative disc disease. "In performing a differential diagnosis, a physician begins by 'ruling in' all scientifically plausible causes of the plaintiff's injury. The physician then 'rules out' the least plausible causes of injury until the most likely cause remains." Glastetter v. Novartis Pharm. Corp., 252 F.3d 986, 989 (8th Cir. 2001). We have previously held that "a medical opinion about causation, based upon a proper differential diagnosis, is sufficiently reliable to satisfy Daubert." Turner v. Iowa Fire Equip. Co., 229 F.3d 1202, 1208 (8th Cir. 2000). A district court may

---

deformity, or abnormality of human beings without the use of drugs or surgery.
    (B) The practice of chiropractic, as authorized under the provisions of this chapter, shall not include the performance of the duties of a midwife or obstetrician, therapy by the use of ionizing radiation, incisive surgery, prescribing for or administering to any person any drug to be taken internally, or puncturing the skin for the purpose of introducing any substance into the body. Nothing herein shall prevent puncturing the skin for routine blood analysis, including red blood count, white blood count, differential and serology, in the practice of chiropractic for diagnostic purposes.

Ark. Code Ann. § 17-81-102(6) (Michie 2002) (Arkansas Chiropractic Practices Act).

exercise its gatekeeping function to exclude only those diagnoses that are scientifically invalid. Glastetter, 252 F.3d at 989.

At trial, Dr. Reilly testified that something other than a fall could cause degenerative disc disease. However, Dr. Reilly indicated that he ruled out alternative sources, such as infection, since at the time of Kudabeck's first examination she did not have a fever, nor did she have redness in her back. Dr. Reilly also ruled out arthritis as a potential source because Kudabeck's x-rays, at the first visit, did not show any signs of arthritis in her back. After taking a medical history, Dr. Reilly initially ruled out genetic etiology. Based on the foregoing information, Dr. Reilly concluded it was unnecessary to run any additional tests to confirm his findings. Dr. Reilly also testified that he followed normal procedures for chiropractors in evaluating and treating Kudabeck. Thus, we reject Kroger's claims that Dr. Reilly failed to perform a differential diagnosis, according the practice of a chiropractor. In essence, Kroger appears to argue that Dr. Reilly did not perform a thorough diagnosis. However, Dr. Reilly performed a sufficient differential diagnosis such that he could treat Kudabeck.

Kroger argues that this case is similar to Turner where the district court excluded the testimony of a treating physician based on his failure to perform a proper differential diagnosis and we affirmed. In Turner, the medical doctor acknowledged that he made no attempt to consider all the possible causes of respiratory problems the plaintiff developed after contact with chemicals from a fire extinguisher. 229 F.3d at 1208. Instead, the doctor came to his causation conclusion as an afterthought, only after being informed that he had misidentified certain chemicals as ingredients in the fire extinguisher. Id. at 1208. This court agreed that the doctor had not "ruled in" a variety of other causes of the plaintiff's respiratory illness. Id. at 1209.

-9-

The present case is different from <u>Turner</u>. First, unlike in <u>Turner</u>, Dr. Reilly's opinion on the condition of Kudabeck's spine did not change over time. In addition, unlike in <u>Turner</u>, Kroger has failed to point out any fact that Dr. Reilly overlooked. Kroger has not performed any independent testing to demonstrate that Dr. Reilly missed an essential fact in his methodology. Simply because Dr. Reilly did not conduct his examination and treatment of Kudabeck in the manner Kroger preferred, does not render Dr. Reilly's testimony unreliable. <u>See</u> <u>Lauzon</u>, 270 F.3d at 693-94 (noting reliable causation testimony need not rule out every possible alternative cause); <u>Westberry v. Gislaved Gummi AB</u>, 178 F.3d 257, 265 (4th Cir. 1999) (same); <u>Heller v. Shaw Indus., Inc.</u>, 167 F.3d 146, 156 (3d Cir. 1999) (same). Finally, nothing in Rule 702, <u>Daubert</u>, or its progeny requires "that an expert resolve an ultimate issue of fact to a scientific absolute in order to be admissible." <u>Bonner v. ISP Tech., Inc.</u>, 259 F.3d 924, 929 (8th Cir. 2001). Kroger's attacks regarding the completeness of Dr. Reilly's methodology go to the weight and not the admissibility of his testimony. <u>Lauzon</u>, 270 F. 3d at 694 ("After discounting obvious alternatives through scientific testing, such as the manufacturing defect, Kelsey need only be able to explain why other conceivable causes are excludable.").

Kroger maintains that Dr. Reilly relied totally on Kudabeck's word about her medical history in formulating his causation testimony. The trial court record reveals that Dr. Reilly based his opinion on more than simply crediting Kudabeck's statements. As stated previously, Dr. Reilly performed chiropractic tests along with physical observations in diagnosing Kudabeck. When he, in his professional opinion, did not see improvement in Kudabeck's condition as he anticipated, he referred her to Dr. Tucker to rule out other possible reasons for her pain and discomfort. Dr. Tucker's report did not refute Dr. Reilly's general conclusions. In fact, Dr. Tucker referred Kudabeck back to Dr. Reilly for further treatment. Dr. Reilly explained that he attributed Kudabeck's present condition to her fall by comparing her 1996 and

2002 x-rays.[10] Thus, Dr. Reilly relied on more than Kudabeck's word in forming his opinion.

Kroger next argues that Dr. Reilly did not cite to or use any study that supported his position that a fall could trigger degenerative disc disease. However, there is no requirement "that a medical expert must always cite published studies on general causation in order to reliably conclude that a particular object caused a particular illness." Heller, 167 F.3d at 155. Instead, "experience with hundreds of patients, discussions with peers, attendance at conferences and seminars . . . are tools of the trade, and should suffice for the making of a differential diagnosis even in those cases in which peer-reviewed studies do not exist to confirm the diagnosis of the physician." Heller, 167 F.3d at 155. Heller also explained "only where a defendant points to a plausible alternative cause and the doctor offers no explanation for why he or she has concluded that was not the sole cause, that doctor's methodology is unreliable." Id. at 156 (emphasis in original) (internal quotations and citations omitted); see also Turner, 229 F.3d at 1208-09 (following Heller in not requiring medical expert to cite published studies on general causation to establish reliability). As Daubert has indicated, publication is not a prerequisite for admissibility. 509 U.S. at 593.

In sum, all of Kroger's arguments on appeal are jury questions. Each of the issues was properly presented to the jury. Kroger had the opportunity to cross-

---

[10]Dr. Reilly explained to the jury:

> [W]ith five years of no care, her spine has gone over to that side. It is a well-documented scientific fact that degeneration advances after a trauma. It is scarring, it [is] a normal reaction for most bodies. You can really see this pressure over here and she can't even stand straight anymore.

(Tr. at 179-80.)

examine Dr. Reilly on all areas in dispute, and Kroger did so. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596. At trial, Kroger had the opportunity to fully attack Dr. Reilly's credentials, which it did.

Kroger has not demonstrated that Dr. Reilly exceeded the boundaries of the general practice and methodology of chiropractors. In addition, the district court properly limited Dr. Reilly's testimony to matters that would be helpful to the jury and are within Dr. Reilly's area of expertise. Dr. Reilly adequately explained to the jury his treatment of Kudabeck and his belief, based on his review of Kudabeck's x-rays, that her fall contributed to her present condition. The court did not allow Dr. Reilly to base his conclusions on the reports of other doctors, including Dr. Tucker. The district court also prohibited Dr. Reilly from testifying regarding his opinion and reading of Kudabeck's MRI based on his lack of training in doing so. The district court sufficiently limited Dr. Reilly to his treatment of Kudabeck and the conclusions he drew from his treatment and expertise. Dr. Cathey, a neurosurgeon, and Dr. Reilly, a chiropractor, did not disagree that the fall caused or could have caused Kudabeck's pain and suffering. Dr. Cathey based his opinion on the aggravation of a preexisting condition, and Dr. Reilly concluded that Kudabeck's fall produced the degenerative disc disease. At least from the fall to the present time, both experts' testimony supported a substantial award of damages even though they disagreed on the medical causation.

In this case, the district court did not abuse its discretion in admitting Dr. Reilly's opinion as reliable. Dr. Reilly based his opinion on his education, training, and proper chiropractic methodology and reasoning in treating Kudabeck and forming an expert opinion. He relied on accepted chiropractic tests and took a thorough patient history. Dr. Reilly did not base his conclusions solely on Kudabeck's statements; rather he used his many years of experience and training to treat

-12-

Kudabeck's condition and provide treatment. Dr. Reilly did not use any experimental techniques and did not deviate in any way from his normal practice of conducting chiropractic examinations.

Even if we were to conclude that the evidence should have been excluded, Dr. Reilly's testimony, in all probability, did not affect the amount of the jury award. See Clark v. Heidrick, 150 F.3d 912, 915 (8th Cir. 1998) (standard for harmless error). The record shows a vigorous and effective cross-examination of Dr. Reilly and a rejection of much of the damages sought by the plaintiff in closing arguments, including the rejection of damages for loss of consortium.[11] In addition, Kroger conceded at oral argument that the jury could have found for Kudabeck based on Dr. Cathey's testimony of causation by aggravation of preexisting condition. The jury could have also based its conclusion, in part, on the medical records from Dr. Tucker.

B.     Jury Instruction

Kroger argues that the district court erred in not providing the jury with optional language from the Arkansas Model Jury Instruction on aggravation of pre-existing conditions. We review a court's jury instructions for an abuse of discretion. See Bennett v. Hidden Valley Golf & Ski, Inc., 318 F.3d 868, 873 (8th Cir. 2003). The district court has broad discretion to choose the form and language of the jury instructions. Id. In a diversity case, such as this one, Arkansas law applies to the substance of the instructions, while federal law "governs our review of the discretion

---

[11]The fact that experts in other fields might also be able to form opinions regarding the cause of an injury and would base those opinions on factors other than those used by Dr. Reilly does not disqualify Dr. Reilly from offering testimony that would be helpful to the jury within his field of expertise. See Smith v. BMW N.A., Inc., 308 F.3d 913, 919 (8th Cir. 2002) (holding forensic pathologist could testify that a properly deployed air bag would have prevented or reduced plaintiff's injuries, even though a biomechanical expert could also testify on the issue).

exercised in refusing or admitting such instructions." Id. (quoting Horstmyer v. Black & Decker, (U.S.), Inc., 151 F.3d 765, 771 (8th Cir. 1998)).

The district court provided the following jury instruction:

> In this regard you should consider the full extent of any injury sustained, even though the degree of injury is found by you to have proximately resulted from the aggravation of a condition that already existed and that predisposed Donna Kudabeck to injury to a greater extent than another person.

(J.A. at 41.) Arkansas Model Jury Instruction 2203 included the following optional language:

> However, you may not award her damages for any pain, mental anguish or disability which she would have suffered even though the accident had not occurred.

The note to the instruction explains: "Do not use the [optional] final sentence unless there is evidence that the claimant would have suffered pain, disability, mental anguish, etc., even though the accident had not occurred." Id.

In order to justify providing the optional language to the jury, Kroger had to demonstrate that Kudabeck would have experienced pain and suffering without the fall and that the fall produced no lasting effects. The evidence from all sources indicated that regardless of any preexisting condition, Kudabeck was in extremely good health and suffered no symptomatology prior to the fall. Kroger has failed to meet its burden. Kroger asserts that Dr. Cathey's general statement in his deposition testimony admitted at trial that "it's possible that the fall at least aggravated these preexisting changes and set into motion her symptomatology," sufficiently meets its burden. However, Dr. Cathey also responded:

-14-

It's hard to answer that question [whether without the fall Kudabeck would have become symptomatic]. Many times these patients remain asymptomatic. Other times some other event, maybe not as dramatic as a fall in a Kroger store - maybe something as simple as getting out of a car or wrenching your back on an icy sidewalk can set these in motion.

So to say that she would have never become symptomatic without a fall, I wouldn't go so far as to say that; but at least according to her history, she was not symptomatic prior to the fall.

(J.A. at 55.) Kroger urges this court to read Dr. Cathey's double negative as support for its position. We do not do so. A large body of other evidence taken with the above opinion of Dr. Cathey and including Dr. Reilly's opinion supports the conclusion that the fall resulted in Kudabeck's pain and suffering. Kroger did not call any additional witnesses or present any contrary evidence to support its argument that the district court should have provided the jury with the optional language. While Kroger notes "Dr. Cathey's testimony is not as articulate as one may hope," Kroger bears the burden of providing substantial evidence for the instruction.

The district court did not abuse its discretion in declining to provide the jury the optional language since Kroger failed to produce evidence to support the instruction. See Barker v. Clark, 33 S.W.3d 476, 480 (Ark. 2000) (holding that "[a] party is entitled to a jury instruction when it is a correct statement of the law and there is some basis in the evidence to support the giving of the instruction").

Finally, we must observe that the issue of continued pain and suffering resulting from a fall, such as the one in this case, can support a substantial award whether based on medical causation of degenerative disc disease from the fall or aggravation of a preexisting condition. Kudabeck suffers from pain attributable to the fall in either situation.

III.    CONCLUSION

In the special circumstances and nature of Kudabeck's symptoms, pain, and suffering following the fall, and looking at the record as a whole, we find no basis to reverse the district court.  Accordingly, we affirm.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.